## MARY C. DEXTER v. AUSTIN LATHROP.

<div style="float:right">136    565<br>39SC³471</div>

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS
OF TIOGA COUNTY.

Argued May 5, 1890—Decided October 6, 1890.
[To be reported.]

(*a*) A contract made in 1850, provided for the sale by the vendor " of all
the pine, norway, and oak timber, suitable for sawing, and down to
twelve inches in diameter at the smallest end of the log, on his tract of
timber land," to be paid for by the thousand feet or by the acre, at the
election of the purchasers;

(*b*) " But in either case they are to take said timber clean as they go, in-
cluding all fit for sawing and down to twelve inches in diameter at the
smallest end of the log: . . . . the timber to be taken off clean; that
is, all good merchantable timber down to twelve inches at the smallest
end of the log."

(*c*) " And also, whether they take by the thousand or by the acre, to cut
the timber clean as they go; that is, when they commence cutting upon
any one hundred acres they will take the timber off from that part,
. . . . . . to prevent them from running over the whole tract and cutting
out the best timber, or the best groves of timber, and leave the balance
scattered over the tract: "

1. The words " down to twelve inches in diameter at the smallest end of
the log," in their connection, did not create a reservation of timber to be
left standing, or an exception of certain sizes out of the general grant
of all the timber, but were parenthetic and explanatory of the duty of
the purchasers to the vendor.

2. Said contract, therefore, construed in the light of the period when it was
made and of its application to the timber on a very large tract, required
the purchasers to cut and remove all good merchantable timber, " includ-
ing all fit for sawing," to be determined when the trees were reached
in the process of removal, down to twelve inches in diameter.

3. Under said contract, the vendor and purchasers did not sustain to each
other the relation of tenants in common, but each was a sole tenant of
his own estate, the one in the land, the other in the timber: Wheeler v.
Carpenter, 107 Pa. 271, and Shiffer v. Broadhead, 126 Pa. 260, explained
and distinguished.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and
McCOLLUM, JJ.

No. 68 July Term 1889, Sup. Ct.; court below, No. 545 No-
vember term 1886, C. P.

Statement of Facts.

On December 1, 1886, Mary C. Dexter and John M. Dexter, her husband, in the right of said Mary C. Dexter, brought trover against C. C. B. Walker and Austin Lathrop, Jr., and on January 11, 1887, filed a statement of claim which closed: "This action of trover is brought to recover treble damages, under § 3 of the act of March 29, 1824, [8 Sm. L. 283] for the timber and lumber cut down, felled, carried away and converted as aforesaid, by and to the use of the defendants." The defendants pleaded not guilty and the statute of limitations. C. C. B. Walker died after suit brought and his death was suggested of record.

At the trial on April 13, 1889, the jury were sworn as to defendant Lathrop alone, and a case was shown which in brief was as follows:

In 1823 Silas Billings had a large body of wild lands, containing about 7000 acres, surveyed into lots of from fifty to several hundred acres each, some of which he sold. On March 1, 1850, he entered into a contract relating to the timber on about 5000 acres of the lands remaining unsold, which was as follows:

"Memorandum of an agreement made the first day of March, A. D. 1850, between Silas Billings, . . . . ¦ of the first part, and Sylvester G. Andrus and Jervis Langdon, . . . . . of the second part; witnesseth, that said Silas Billings, in consideration of the covenants and agreements herein mentioned on the part of the said Andrus & Langdon to be performed and fulfilled and kept, doth agree to sell and by these presents doth sell to the said Andrus & Langdon all the pine, norway and oak timber suitable for sawing, and down to twelve inches in diameter at the smallest end, on his tract of timber land lying . . . . . containing between four and five thousand acres. . . . . It is hereby stated and expressly agreed upon between the parties that it shall be optional with the said Andrus & Langdon to have the whole of the pine and norway and oak timber on the lands above specified at ten dollars per acre for the timber, payable as fast as the same shall be taken off, or to take all the white pine, norway and oak timber at ten shillings per thousand feet, board measure, or to take so much of the white pine timber from the upper two thousand acres as shall amount to three thousand dollars, with interest, at one dollar and seventy-five cents per thousand feet, board measure, or from

Statement of Facts.

any part of the balance of the tract at one dollar and twenty-five cents per thousand feet, board measure, which option shall be decided by the said Andrus and Langdon within sixty days from this date and notice given to the said Billings, accordingly, within that time; but in either case they are to take said timber clean as they go, including all fit for sawing and down to twelve inches in diameter at the smallest end of the log. And the said Andrus and Langdon, in consideration of the premises, covenant, promise and agree to pay to the said Billings, as above specified, as fast as they shall take off said timber; and if they take the whole by the acre at ten dollars per acre as above specified, or by the thousand feet as above expressed by the thousand feet and agree to advance to said Billings three thousand dollars, as follows, to wit: . . . . . If taken by the thousand feet, the quantity in the logs is to be settled for by measurement on the bank before running, the timber to be taken off clean; that is, all good merchantable timber down to twelve inches at the smallest end of the log; and the said Andrus and Langdon agree to take all the good merchantable oak and norway at the same rate as the white pine, if they elect to take the whole timber by the thousand, and also whether they take by the thousand or by the acre, to cut the timber clean as they go; that is, when they commence cutting upon any one hundred acres they will take the timber off from that part. It is not the intent or design of this contract to prevent the said Andrus and Langdon from cutting on more than one piece at a time, for it is expected they will work at several different points at the same time; but it is expressly intended to prevent them from running over the whole tract and culling out the best timber, or the best groves of timber, and leave the balance scattered over the tract. . . . . . And the said Andrus and Langdon hereby covenant and agree to take off at least three million feet of said timber, board measure, per year, and are at liberty to take as much more per year as they think proper, paying for the same as above agreed as fast as taken; . . . . . In witness whereof the said parties have hereunto set their hands and seals on the day and year first above written.

                    "SILAS BILLINGS,    [SEAL.]
                    "S. G. ANDRUS,      [SEAL.]
                    "JERVIS LANGDON,    [SEAL.]"

Before the expiration of the sixty days' option, Andrus and Langdon assigned their interest in the foregoing contract to John C. Cameron and others, and on October 25, 1852, Billings entered into a written agreement with the then assignees of the contract by which " with a view to a final arrangement and settlement of the annexed contract, so far as the purchase money of the timber and the quantities are concerned," the said Billings consented to receive the sum of $23,065.24, which the other parties bound themselves to pay in specified instalments.

Billings died in 1853, intestate.   On July 3, 1854, his heirs, by proper conveyances, divided among themselves the lands covered by the Andrus and Langdon contract, and Mrs. Dexter, the plaintiff, received a conveyance of certain numbered lots containing 675 acres, as her share thereof.

Timber was cut upon lots of the plaintiff, by different parties, operating under the contract, from the winter of 1852–3 to 1860 ; none was cut from 1860 until the fall of 1864, when Walker and Lathrop, as assignees of the contract, began cutting timber, and continued from time to time until 1870.   Mrs. Dexter was married to her present husband in 1862.

The plaintiff, claiming that the defendants had no right, under the contract, to cut and remove any timber that in 1853 was less than twelve inches in diameter at the top of the first log, made an offer to prove by Benson Tubbs, a witness on the stand, what the growth in diameter of the pine timber was, from 1853, when the contract with Andrus and Langdon was to go into effect, up to the time the same was cut and converted by the defendant; this, for the purpose of charging the defendant with the cutting of all timber that in 1853 was not twelve inches in diameter at the top of the first log.

Objected to.

By the court:   We adhere to our conclusion as to the proper construction of this contract, and sustain the objections ; exception.[1]

The plaintiff, claiming further, that all the plaintiff's lots had been cut over prior to 1860, that the rights of the assignees of the contract were then exhausted, and that defendant had no right to enter upon plaintiff's lands for any purpose in 1864, offered to prove the operations upon the lands at the various dates from 1853 to 1860, and the suspension thereof until the fall or winter of 1864, until the defendant began operations.

Objected to.

By the court: Objections sustained; exception.[2]

At the close of the testimony, the court, MITCHELL, P. J., charged the jury in part as follows:

[By that contract Silas Billings sold to Andrus and Langdon all the pine, norway and oak timber suitable for sawing, down to twelve inches in diameter at the smallest end of the log, standing on the lands covered by the Billings contract; and among these lands are the lands of the plaintiff in this action, Mrs. Dexter. If the contract had no further reference to the quality and character of the timber, or to the subject of the sale of the timber, than the words occurring in the first part of it, we think the construction might be different. But there are several other references to that matter, in the contract, and taking them all together we think the proper construction is that Mr. Billings sold all of that particular kind of timber, that is, pine, norway and oak, not only that which was of the size described at the time the contract was made, but also all that should be, or that should come up to that size, at any time before the whole of the timber sold should be taken from these lands. The substance of this is, that we think this contract is, in effect, a sale of the timber on the Dexter lands, which had grown to be of that size at the time of the cutting shown by the evidence in this case.][3] . . . . .

It is true, in the contract the vendees are required to cut off at least three million feet a year, but there is no evidence in the case showing how many millions there were on this body of lands; so there is nothing, really, by which the court and jury can determine what time was contemplated, if any time was contemplated by the parties, that this timber should be taken off. [Therefore we think no time was fixed by the parties to that contract; and, as there was no time fixed, so long as timber of the character described in the contract was standing upon the lands of Mary C. Dexter, the plaintiff in this case, these vendees, Andrus and Langdon, and all persons claiming under them, had the right to enter upon these lands and cut that timber. So we have come to the conclusion that the entry of Walker and Lathrop, claiming under that contract, was a lawful and proper entry made for that purpose.][4] . . . . .

Charge of Court below.

[We say to you, then, that we regard this as the meaning of that contract; that it transferred from Silas Billings to Andrus and Langdon all the timber suitable for sawing, pine and norway and oak, down to the size defined in the contract itself, and that, so far as the size is concerned, the vendees of that timber and those claiming under them had a right to take down to that size, when they should cut it.] [5] We believe that is a reasonable construction of that contract. As a matter of course, when a large tract of lands like these is entered upon for the purpose of lumbering, it would be only husband-like or lumberman-like, so to speak, to cut off all that would be suitable for sawing or manufacturing purposes. And that evidently was contemplated by the parties. And very likely it was intended, as has been argued, to be obligatory upon the vendees to take the timber down to the size described in the contract, twelve inches at the top of the first log. But, gentlemen, if it made it obligatory upon their part to take that timber, the obligation must have been mutual and the rights resulting from it mutual. That is one of the principles that must be considered in construing contracts; they must be mutual. And if the vendees had the right to take the timber down to a certain size, then the vendor had the right to require them to pay for the timber down to a certain size. That fixes the limit of the timber that could be taken under this contract. And we think the owner of the land had in contemplation the growth of the timber at the time the contract was made, in saying that timber of such a size might be cut, and that when you cut you shall cut clean and down to a certain size. . . . . .

[This action is brought under an old act of assembly, the act of 1824, which is a highly penal statute, enacted for the purpose of preventing trespasses upon wild lands. In a new and woody country like this, it was no uncommon thing for a man to trespass upon lands of that kind, and this act was intended to prevent such a trespass. In any case coming within this provision, if the timber was cut and left on the ground, the value of it was doubled; but, if cut and taken away, three times its value was allowed for such trespass and conversion. But, gentlemen, we do not think this is one of those cases contemplated by the act of 1824. Therefore, we are not disposed to submit the question of double or treble damages, if any are to be recovered in this case, to you.] [6]

Charge of Court below.

The reason why we think that act does not apply in this case, will be given in answer to a point submitted to the court. . . . .

The defendant's counsel ask the court to charge the jury:

1. That, under the pleadings and evidence in this case, the plaintiff cannot recover for any timber cut or converted prior to six years before the commencement of this suit.

Answer: The first point is refused. We charge you that if you are satisfied from the evidence that Mary C. Dexter was the wife of John M. Dexter, at the time when the timber trees for the cutting and removing of which this suit was brought were cut and removed from her lands by Walker and Lathrop, and continued to be his wife down to within six years of the time when this action was commenced, the statute of limitations does not apply to her, and therefore has no application in this case. . . . .

2. The contract of Silas Billings to Andrus and Langdon, selling to the latter the norway and white pine and oak timber growing on the four or five thousand acres described in said contract, with the unlimited right of ingress and egress to enter upon the lands and cut and carry away said timber, constituted said Billings and his heirs, and Andrus and Langdon and their vendees, tenants in common in the lands and timber described in said contract.

Answer: To this point we say, we think the second point so broadly stated that it is liable to mislead you in the proper determination of the issues involved in this case, and therefore we decline to affirm it. We say to you that the sale of certain pine and oak timber, on the lands described in the Billings contract and of the quality and dimensions prescribed therein, vested in Andrus and Langdon and their vendees an estate in the said lands, and the right to enter thereon to cut and remove such timber, for an indefinite period of time. The quality of this estate so vested in the vendees of that timber is such that the law requires its conveyance to be evidenced by writing, or by such other proof, as is required by law, to transfer the title to any permanent interest in lands from one person to another. Therefore, we charge you, in substance as requested in this point, that, by virtue of that contract, Andrus and Langdon were tenants in common with Silas Billings in the lands therein described, and that the successors in right to the interest of the

parties to that contract occupy the same relation to each other, and must continue so to do until the right to enter and cut and remove said timber is exhausted by the removal thereof, or abandoned and determined by neglect to remove the same, after reasonable notice so to do. And, as the parties were and are tenants in common in the lands, they were and are also tenants in common in the timber described as sold in the contract.[7] . . . . .

3. That, prior to the act of May 4, 1869, [P. L. 1251,] tenants in common could not maintain trespass or trover against each other for cutting and carrying away timber from the lands owned in common, without first proving actual ouster; and the act of 1869 does not authorize a recovery in trespass or trover for acts committed prior to its passage.

Answer: In answer to this point we say to you that Mary C. Dexter has not such an ownership in the lands from which the timber in controversy in this suit was cut, as entitles the plaintiffs to recover double or treble damages for any of the timber cut by or under the direction of Walker and Lathrop, or either of them, under the evidence in this cause. She has not such a complete and unqualified title and possession of those lands, or any of the pine or oak timber thereon, as is contemplated in the act of 1824; and therefore the defendant is not liable to her in the highly penal damages provided for in said act. The act of 1869, which affords certain remedies to tenants in common, for cutting timber by their co-tenants without consent in writing so to do, has no application to this case.[8]

4. Tenants in common cannot maintain trespass or trover under the act of 1824, giving double and treble damages for cutting and carrying away timber from the premises owned in common, and the act of May 4, 1869, has not changed the law in such cases.

Answer: What we have said in response to the third point, is a sufficient reply to the fourth; and we therefore say to you that there can be no recovery of double or treble damages in this suit.[9]

5. If the jury find from the evidence in this case that Walker and Lathrop are vendees under Andrus and Langdon or their vendees, then the defendant had the right of entry upon the

Charge of Court below.

lands described in the contract of Billings to Andrus and Langdon, and had the right to select and carry away such timber as he and the persons in his employ thought suitable under the contract; and if they cut and carried away from said premises, during the time they were occupying the same, timber to which they were not entitled under their purchase, they are not liable for such excess in an action of trespass or trover. Consequently, the plaintiff cannot recover in the form of action she has adopted.

Answer: We decline to affirm this point. In response to this point, we say to you that if you are satisfied from the evidence that Walker and Lathrop had title to and were the owners of any of the pine or oak timber, conveyed to Andrus and Langdon by their contract with Silas Billings, upon lands of Mary C. Dexter, at the time they cut the timber in controversy, they had the right at that time to enter and cut and remove the same, and had the right to select and cut and remove all such timber suitable for sawing and down to twelve inches at the top of the first log of the tree selected for such cutting, and that they might lawfully do this by their employees. But we say to you that the defendant is liable in this form of action for whatever timber of a size less than twelve inches at the top of the first log was cut on the lands of the plaintiff by Walker and Lathrop, or by others under their direction and for their use and benefit, provided the same was manufactured for them, delivered to them, and sold and converted to their own use by them, so mixed and confused with other timber and lumber of their own that the identical timber and lumber of the plaintiff, Mary C. Dexter, thus wrongfully cut from her lands, could not be followed, identified and separated from that of Walker and Lathrop, in their possession or in the possession of those to whom they may have sold the same. But if you find from the evidence that such timber of Mary C. Dexter was not cut by or under the direction of Walker and Lathrop, or of the defendant Austin C. Lathrop, but was cut, removed, sawed and delivered to them, thus mixed and confused with their own lumber, by Mr. Bonham, as an independent contractor with them, and not as their own employee subject to their direction, and that neither they nor the defendant directed or controlled the cutting thereof, under

Bonham, but the same was cut wholly under the direction of Bonham, then we say to you the defendant is not liable therefor in this action, unless you find that he had actual knowledge of such wrongful cutting of the timber of Mary C. Dexter, before the same was delivered to Walker and Lathrop, or, if sold by them, before the same was sold.[10]

6. That the plaintiff cannot recover in any case in an action of trover, where the defendant in the first instance came lawfully into the possession of the property claimed to be converted, without a demand and refusal. And the defendant in this case being lawfully in the possession of the property, as a tenant in common with the plaintiff, and no demand or refusal having been shown, there cannot be a recovery.

Answer: We think what we have said, in answer to the former points in the case, a sufficient response to this point; but we might remark that as a general rule there must be a demand to recover in an action of trover, where the defendant comes lawfully into the possession of personal property. That is the usual rule. Trover is an action of tort, as it is called. It implies a wrong on the part of the person complained of, and it is the duty of the person complaining to be neighborly enough to make a demand; but it is not necessary in every case, and in this case we are unable to say, as matter of law, that the defendant was lawfully in possession of this property. It is one of the questions of fact you are to determine under the evidence and the instructions of the court.[11] . . . .

Very considerable has been said about this form of action, whether such an action can be maintained. We perhaps have said enough to you on that subject. We think, gentlemen, that an action of trover is very different from an action of trespass in respect to a case like this. In an action of trespass the plaintiff must allege that his close, his campus, is broken into and entered by the defendant. Trover is not brought for the cutting of this timber, or the entry upon the lands of another. Damages for that entry are waived by the plaintiff in this action. She does not claim any damages for the mere entry, but it is for what was done after the entry upon the lands. That is the claim in this case.

The jury returned a verdict in favor of the defendant.

Judgment having been entered, the plaintiff took this appeal, assigning for error:

1, 2. The refusal of the plaintiff's offers.[1] [2]

3–6. The portions of the charge embraced in [ ] [3 to 6]

7–11. The answers to the defendant's points.[7 to 11]

*Mr. J. B. Niles* and *Mr. M. F. Elliott* (with them *Mr. A. R. Niles* and *Mr. F. E. Watrous*), for the appellant:

1. The sale by the contract was a present one, and the title to all such timber as passed by the sale vested at once in the vendees, and such timber as the title thereto did not presently vest in them remained the property of Billings and descended to his heirs. To what timber trees did the title at once vest in the vendees of Billings? There is no difficulty in understanding the language employed to describe the timber sold. If it is a correct construction of the agreement, that trees less than twelve inches in diameter, when the contract was made, became the property of the vendees whenever they grew to the diameter of twelve inches, then a certain class of trees would belong to the plaintiff one year, because they were less than twelve inches in diameter, and she could cut and remove them, but if she did not do so, and the next year by growth they became twelve inches in diameter, the title would change from the plaintiff to the defendant and he alone would have the right to cut and take them from the land.

2. Under the provision of the contract, that " when they commence cutting upon any one hundred acres they will take the timber off that part," we contend that the vendees of the timber, when they commenced cutting on any particular lot, ·were bound to continue operations from year to year, cutting clean as they progressed, until all the timber which they had purchased was removed; and, that having cut and removed timber therefrom from year to year, continuously until 1860, they had no right to cease operations until 1864, and then resume. If they could abandon the lands of the plaintiff for four years, and then return and cut over them again, there is no limit to their right to crop the lands covered by the contract, and they might return after twenty years abandonment.

3. In Shiffer v. Broadhead, 126 Pa. 260, this court recently placed a construction upon a contract somewhat similar to the

one under consideration in this case. The referee's conclusion of law, in that case, that the contract for the sale of the timber should be construed as having been entered into with reference to the general custom prevailing, that the minimum size of trees standing was that of ten inches in diameter at the top end of a log twelve feet in length, first cut from the butt, was sustained by this court, and it was further held that the vendee and the contractor under him were liable in trespass for cutting trees which were not of that diameter when the contract was made. In that case, the size of the timber when the contract was made was ascertained by counting growths back from the time of the trial. It differed from our offer only in method.

4. We do not think the plaintiff and defendant were tenants in common of the land, and it certainly is not possible that they were tenants in common of the timber described as sold in the contract. Billings remained the owner and was in full possession of the land, and of such timber as was not sold by the contract. The vendees of Billings owned certain timber trees standing on Billings' lands, and they had the separate right to cut and convert such trees. The vendor and his vendees were no more tenants in common of the timber sold than they were of the hemlock timber, all of which was unsold and belonged to Billings. The act of May 4, 1869, P. L. 1251, has therefore no application, nor have the cases cited in reference to it.

5. But this court held in Shiffer v. Broadhead, before referred to, that an action of trespass for treble damages, under the act of 1824, could be maintained against the vendee, his contractors and servants. And it is of no consequence whether the cutting of plaintiff's timber was wilfully or mistakenly done by the defendant or his employees. Moreover, Walker and Lathrop were bound to know whether their contractor Bonham was cutting and delivering to them their own timber or that of the plaintiff. They sent him on the land to cut what they claimed to be their timber. " One is liable for his own tortious act, or for that of his agent or servant, when done by his direction or with his assent, and sometimes when he neither directs the act, nor assents to its commission, when it is done for his benefit: " Bard v. Yohn, 26 Pa. 490; Dundas

Arguments.

v. Muhlenberg, 35 Pa. 351; Wharton on Agency, § 474, n. 3; 2 Kent Com., 825, n.; McCloskey v. Powell, 123 Pa. 62; Shiffer v. Broadhead, 126 Pa. 260.

*Mr. J. W. Ryon* (with him *Mr. S. F. Wilson* and *Mr. J. Harrison*), for the appellee:

1. It is submitted that the offer to prove by witnesses, not experts, and without any apparent knowledge, skill or ability, the probable growth of white pine, norway pine, and oak timber, from 1853, up to the time when it is alleged the timber was cut, is a most novel proposition. No fact was proposed to be proved; the most that was offered was the opinion of the witnesses referred to, as to the growth of the timber embraced in the offer. Shiffer v. Broadhead, 126 Pa. 260, is not an authority for the admission of the offer, which proposed to submit to the jury simply the guesses of witnesses as to the probable growth, not the counting of the annual growths or rings, to ascertain the increased diameter.

2. The contract was an entire one embracing all the lands described therein. The plaintiff, long after the execution of the contract, became the owner of but a small portion of the original 5,000 acres, and expressly subject to the reservation of all the timber embraced within the contract. That there had been a cessation of the cutting, on the plaintiff's portion of the land, was of no materiality. Forfeitures are not favorites of the courts, even where they are stipulated for between the parties; but forfeitures, not provided for and not contemplated by the parties, are not often declared by the courts. Where there is no provision made in the contract, for the removal of the timber, no such dangerous consequences can follow: Boults v. Mitchell, 15 Pa. 371; and there is no allegation of the violation of a single covenant by the vendees.

3. There can be but little doubt upon well-settled principles, that after the execution of that contract for the sale of the standing timber, the vendor and vendees were tenants in common of the land upon which the timber was standing. In Pattison's App., 61 Pa. 294, a controversy respecting the present contract, this court decided that a contract for standing timber on a tract, to be taken off at discretion as to time, is an interest in land. Growing timber is a part of the realty, is parcel

of the inheritance, and may be separated from the rest by express reservation or grant: Clapp v. Draper, 4 Mass. 265; Putnam v. Tuttle, 10 Gray 48; Adams v. Iron Co., 7 Cush. 367; White v. Foster, 102 Mass. 375; McClintock's App., 71 Pa. 365. And a grant of suitable timber confers upon the grantee and his assigns, not only the right to enter for the purpose of cutting and removing it, but the right to select and judge of its suitableness: Boults v. Mitchell, 15 Pa. 379; Six Carpenters' Case, 8 Rep. 146 (1 Sm. L. C. *216.)

4. Thus, the contract for the standing timber gave the vendees and their assigns, not merely a right to the timber growing upon the land, but an actual interest in the land itself. The title of the vendees was an estate in the land, and as such was within the statute of frauds, requiring a written conveyance to pass such an interest. The rule, therefore, that one tenant in common cannot maintain trespass against a co-tenant, for breaking and entering the close, is a well established doctrine of the common law, and wherever that form of action may be resorted to between tenants in common, it is because there has been legislation changing the common law. The case of Wheeler v. Carpenter, 107 Pa. 274, applies with full force to this case, and demonstrates the accuracy of the charge of the court below.

5. The timber taken from these lands was taken under a contract let to Bonham to cut, manufacture and deliver, for so much per thousand; and it was distinctly proved that Bonham was under a specific contract to cut no timber upon the lands but the timber accurately described in the Andrus and Langdon contract. If other timber was ever cut by Bonham, no authority was ever given to cut it. " In order to fix the liability of a master for the act of a servant, it is not enough that the act of the servant was done with the intent to benefit or to serve the master; it must be something done in doing what the master employed the servant to do: " Wood on M. & S., 545; Eaton v. Railroad Co., 59 Me. 520; Painter v. Pittsburgh, 46 Pa. 213; Allen v. Willard, 57 Pa. 374.

OPINION, MR. JUSTICE WILLIAMS:

This case depends on the construction of the contract of March 1, 1850, between Silas Billings, of the one part, and Andrus and Langdon of the other part. It is what is known

as a timber contract, was made forty years ago when the facilities for transportation were less, and the cost much more, than now, and it should be read in the light which the business to which it relates, with the incidents and usages of that business as then conducted, may throw upon it.

The cost of transporting logs to a mill, and the sawed lumber from the mill to some line of transportation, ordinarily a canal or a navigable stream, was so great as to make it important to remove all the timber that was worth removing by the same job or operation. The owner of wild lands, when about to sell his standing timber for removal, would therefore fix a price intended to cover the average value of the trees on the stump. In this way, the good qualities were made to sell the poor, the large trunks to sell the small ones, and those easy of access to carry with them those more difficult to reach. To protect his uncut timber from the forest fires that follow the woodsman, it was important for him to require the purchaser to cut clean, taking all the timber of the kind sold as he advanced over the tract. In this way he would keep the standing timber unbroken before him, as he moved along, and leave nothing behind to be destroyed by fire. In order that he might receive pay for all that was worth paying for, he would insert in his contract a stipulation requiring the buyer to remove and pay for all merchantable logs suitable for sawing ; and, to reduce as much as possible the room for controversy, it was usual to provide that, as to size, logs should be deemed suitable down to twelve or ten inches in diameter at the small end of the log. After the contract was made, the buyer would consider the topographical situation of the tract, and push his roads, slides, or logways into the timber along some hollow or hillside, in in such way as to enable him most conveniently to reach it. So much of the surface as could be reached from one road or system of roads was then cleared of its timber trees, and when this was accomplished another hollow or the opposite hillside was entered and cleared of its trees, in the same manner, until all the timber was removed. If a tree was left standing or a log unremoved when operations ceased on any part of the tract, it was in danger of destruction by fire; but, if spared by the fire, the cost of its subsequent removal by itself was so much greater than if it had been taken with the timber about it as to

render it valueless to the owner of the land. Stipulations upon all these subjects were usual, because they were necessary for the protection of the seller and to prevent controversy between the parties about their respective rights.

With this glance at the business to which it relates, let us now look at the provisions of this instrument. They provide for the sale by Billings to Andrus and Langdon of "all the pine, norway, and oak timber, suitable for sawing and down to twelve inches in diameter at the smallest end of the log, on his tract of timber land." The purchasers may pay for the timber by the thousand feet or by the acre, at their election, " but in either case they are to take the timber clean as they go, including all fit for sawing and down to twelve inches in diameter at the smallest end of the log." The reason given for requiring the timber to be cut clean is that, " when they commence cutting on any one hundred acres, they will take the timber off that part." If the purchasers elect to pay for the timber by the thousand feet, it is provided that it shall be measured on the bank before its removal, and that the timber shall be cut clean. This phrase is explained thus: " That is, all good merchantable timber down to twelve inches at the smallest end of the log." It is stated that operations may be conducted simultaneously on different parts of the tract, but at each place they must be conducted in the same manner, for, as the contract again explains, " it is intended to prevent them from running over the whole tract, and cutting out the best timber, or the best groves of timber, and leave the balance scattered over the tract."

We have now brought together all the provisions of the contract that described the character of the timber sold, or the manner in which it is to be cut and removed. Though evidently not the work of a lawyer, it was drawn by one who had a thorough, practical knowledge of the lumber business, and the ability to express his ideas with clearness and precision. The purpose to protect the seller, and to compel the buyer to remove all the timber suitable for sawing in the manner best calculated to preserve that left standing from fire, runs through every part of it; but there are no words of exception or reservation to be found, and none from which the existence of a purpose to reserve any part of the timber can be inferred, un-

less the phrase "down to twelve inches in diameter at the smallest end of the log" be held to justify such an inference. These are the words on which the appellant relies. They occur three times in the contract, and each time they are used as part of the description of the timber which the buyer is to take and pay for. They are first used to describe the timber sold, thus: "All the pine, norway, and oak timber suitable for sawing and down to twelve inches in diameter at the smallest end of the log." In both the other places where they are found, they are used in stating the duty of the buyers, as in this sentence: "They are to take said timber clean as they go, including all fit for sawing and down to twelve inches in diameter at the smallest end of the log." Taken in the connection in which we find them, what do these words mean? We must remember that the purpose of the seller was to turn his standing timber into money, and that of the buyers was to saw it into marketable lumber for sale. It was the interest of the seller to require that all merchantable timber on his land should be removed and paid for. But what is a merchantable log? That depends on its size and quality, and the interest of the buyer is to handle such as will yield the largest margin over the cost of manufacture. His profits come largely from the better qualities and larger sizes. Whether a log is of a merchantable quality can only be determined on examination, but what shall be deemed a merchantable size may be settled in advance by the terms of the contract.

This contract requires the buyers to remove and pay for all the pine, norway, and oak timber suitable for sawing, and it in effect declares that a log twelve inches in diameter at the smallest end shall be deemed suitable as to size. This is not a reservation of timber to be left standing on the tract, or an exception of certain sizes out of the general grant of all the timber, but it is a parenthetic and explanatory sentence defining the duty of the buyers towards the seller. The first paragraph in which it occurs should be read thus: "Said. Billings sells all the pine, norway, and oak timber suitable for sawing (and, as to size, logs down to twelve inches in diameter at the smallest end shall be deemed suitable) on his timber tract," etc. These words should be read in the same manner wherever they occur, and understood as the declaration or agreement of

the parties that a log twelve inches in diameter was, as to size, suitable for sawing, and to be paid for by the buyers as such. So much of the ground for controversy opened by the phrase "suitable for sawing," was closed by the agreement of the parties in advance. The effect of the contract, when read in the manner we have suggested, is to sell to Andrus and Langdon "all the pine, norway, and oak timber" on the land that was suitable for sawing. In the language of the contract, the timber was "to be cut clean" from the tract, so that no merchantable logs, or logs fit for sawing, should be left behind when the cutting was completed. Below twelve inches in diameter the buyers might determine suitability as to size as well as suitability as to quality, but at twelve inches and upwards it was settled by the contract, and they were bound to take and pay for them if their suitability depended on size only.

Such being the meaning of the contract, we are to inquire when the question of suitability for sawing was to be determined? The contract fixed three millions of feet as the minimum amount to be removed annually. Assuming that it was removed at this rate, in the absence of any complaint on that subject, it required seventeen years to remove it all, as the evidence shows us. The buyers were to move carefully over the tract, cutting clean as they went, and leaving the uncut trees in a body before them. The question of the suitability of a tree for sawing must therefore be settled when the tree was reached in the process of cutting the timber. If suitable then, it must be taken and paid for. If unsuitable, it had no value to seller or buyers, and was left behind as worthless when the woodsmen moved forward. The learned judge of the court below was right, therefore, in excluding the evidence offered to show the growth of the trees between the date of the contract and the time of actual cutting on the land of the plaintiff. It was wholly immaterial what that growth might have been, for, under the terms of the contract, suitability for sawing was to be determined when the trees were reached in the process of removing the timber, and not before. But the learned judge stopped short of the logical result of his own construction of the contract, when he instructed the jury, in substance, that the words "down to twelve inches in diameter at the smallest end of the log" were to be understood as limit-

ing the meaning of the words " all the pine, norway, and oak timber suitable for sawing," and equivalent to a reservation by the seller to himself of all timber less than twelve inches in diameter. In this he was wrong.

The words are not a reservation in form or in legal effect. They were not intended nor do they operate as a limitation upon the right of the purchasers to take all the timber suitable for sawing on the land; but they were intended, and their legal effect is, to compel them to take, as of suitable size, all logs down to the limit named. Below that size the right and the duty to take depend on suitability for sawing, to be determined not by the contract, but by the usages of the trade, the character and location of the timber, the length of haul to reach the stream or the mill, and the character of the surface over which it is to be taken to reach the roads and logways. If the haul is short and the grade easy, a small log may be hauled with profit, which, at a greater distance or over difficult roads, could not be made to pay the cost of getting it to the mill. Let us suppose that the purchasers, in the course of their work, come to a tree having sufficient size near the ground to justify the expectation that it would furnish a log twelve inches or more in diameter at the small end. They cut it and find on actual measurement that the taper of the tree exceeds their estimate, and the log actually measures at the small end but eleven and one half inches. It is straight, free from knots and shakes, and of good quality. What must be done with this log? If the learned judge was right in his construction of the words we have been considering, the purchasers would have no right to remove it, and would be liable in trepass for twice its value for cutting it. If this was really so, the position of the purchasers would be one of some hardship. They cannot measure, nor can they estimate with absolute exactness the diameter of a tree at sixteen or thirty-two feet from the ground. If they under-estimate it and leave the tree uncut, they are liable to pay for it on their contract. If they over-estimate it, they must leave it behind, and pay twice its value for having blundered in cutting it. Under our view of this contract, the purchasers would have the right to take the log notwithstanding its scant diameter, if satisfied to do so, and manufacture it, paying for it in the same way that they pay for the rest of the timber. They cannot be

Opinion of the Court.

compelled to take smaller logs than the contract describes, but they may take them, under the terms of this contract, if they are in other respects suitable for sawing, and pay for them at the same rate and in the same manner that they pay for the rest of their timber.   This construction makes it possible for the purchasers to do as they undertook to do, and clean the tract of "all pine, norway, and oak timber suitable for sawing," cutting it clean as they go, taking all the good, merchantable timber "fit for sawing," (and down to twelve inches in diameter at the smallest end of the log shall be deemed fit as to size,) and leaving suitability for sawing, in smaller logs, to be settled by circumstances, when they are reached.   Any other construction would fail to reach the intent of the parties, and lead to endless confusion.

Perhaps it would be well to leave this case without further consideration of the assignments of error, as it must necessarily rest upon the construction which we have put upon the contract.   There is one other subject, however, to which we think it our duty to advert in order to correct a misapprehension.   In answer to the defendant's second point, the learned judge told the jury that, under the provisions of their contract, Andrus and Langdon became tenants in common with Billings in the land covered by it.   He said, "and as these parties were and are tenants in common in the land, they were and are also tenants in common in the timber described as sold in the contract." We cannot agree to this definition of the relation these parties occupied towards each other.   Tenants in common have distinct titles to separate parts of an undivided whole, but no one of them has an exclusive right in any part of the whole. The land being held in common, each tenant has a right to possession, which is incident to his title and extends over every part of the land so long as the tenancy in common continues, but partition may be compelled at any time, and, when made, the title and the right of possession in each becomes several and attaches to the purpart assigned him, so that each owns a distinct messuage by a distinct and several title.   Until partition is made, account render or a bill in equity will lie, if one tenant takes the share of the rents and profits belonging to another.

It seems to us very clear that this was not the relation existing between Billings and Andrus and Langdon.   He sold them

no part of his land as such, but the standing timber, growing on the land. Their right to what they bought was a separate, absolute, undivided one, and was exclusive of their vendor. Billings's title to his land remained after the contract, as it was before, a separate, absolute and undivided one. He had sold, and the purchasers had acquired, as incidental to the purchase of the standing timber, the right to have their trees stand on and receive sustenance from the soil until they could be cut and removed; and the right to enter the lands, and do thereon all things needful in order to cut and remove the timber in the manner and at the rate provided for in the contract. For all purposes not inconsistent with the rights of his vendees of the timber, Billings was in possession of his entire tract as owner, and his right to the possession was (subject temporarily to the rights of the timber owners) a separate and an exclusive one. He retained no interest in, or fractional part of the title to the standing timber. Andrus and Langdon acquired no title to the land. Each owned his own estate by a title that was several and exclusive. They might be in possession of different parts of the tract, or of the same part for different purposes. Their possession might be contemporaneous and concurrent, but the right of possession of each would rest on, and its extent would be determined by his estate, one being sole owner of the land, the other being sole owner of the trees. The situation is substantially that which is created when the owner of land sells the stratum of coal which underlies it to a mining company. The owner of the coal has an exclusive right to the possession of his own estate. The owner of the surface has a like exclusive right to its possession, subject to the right of entry incidental to the grant of the coal, which resides in his grantee. They are not tenants in common of the coal or of the surface, but each is a sole tenant of his own estate.

The case of Wheeler v. Carpenter, 107 Pa. 271, is relied on by the appellee, and seems to have been relied on by the learned judge as authority for the doctrine of the charge. The facts of that case were that the owner of land having pine trees standing upon it, sold the land, reserving the trees, and incorporated into his deed a reservation to himself of the "pine timber suitable for sawing," without fixing any limit of time for its removal. It might be practicable to distinguish that

case from this upon its facts, but it is not necessary to attempt it. It was an action of trespass in which the jury found that the defendant cut trees not included in the reservation, and returned a verdict for single damages, which the court trebled. The question in this court was over the liability of the defendant to treble damages under the act of 1824, and the action of the Common Pleas was reversed, and judgment entered on the verdict for single damages. The plaintiff in error was represented by the Hon. Geo. A. Jenks, and the Hon. W. L. Corbit, both good land lawyers, and their position was that their client had an interest in the land by virtue of the reservation in his deed, which continued until his timber was removed, and gave him a right of entry to select, cut, and remove it. Having this interest in the land, they argued that he, like a tenant in common, was not within the letter or the purpose of the penal provisions of the act of 1824. This was the point ruled. The plaintiff below argued that this objection was removed by the act of 1869, which expressly provides that one tenant in common shall have every remedy in law and equity against his co-tenant who cuts timber belonging to them, without his consent, that he has against a stranger to the title. But this court decided that a remedy and a penalty were to be distinguished, and that giving the former did not, ex vi termini, carry the right to proceed for the latter. Whatever may have been said in elaborating them, the points adjudged were only those we have now stated.

Boults v. Mitchell, 15 Pa. 371, is in harmony with the doctrine of Wheeler v. Carpenter, although the point ruled is not the same. That was an action against the owner of the timber brought by a subsequent purchaser of the land. The defendant justified under the right of entry incidental to his ownership of the timber. The plaintiff alleged that the reservation of the timber was not good against him, and claimed title to it by virtue of his purchase of the land. The jury found against the plaintiff on the facts, and it was held that, having the title to the standing timber, the defendant had the right to enter and remove it. The Six Carpenters' Case, 8 Rep. 146 (a), 1 Sm. L. C. *216, really throws no light on our question. That was an action of trespass brought by a tavern-keeper to recover for wine and bread consumed by the six car-

penters, for which they failed to pay. On demurrer, it was held that the action would not lie, and that the remedy of the tavern-keeper was in debt. Having entered the tavern lawfully for the purpose of procuring refreshment, the carpenters were not turned into trespassers by the omission to pay for what was furnished them. They had a right of entry. They entered for a lawful purpose. After entry, they committed no act of violence, and they were liable to pay for their entertainment as for any other debt contracted by them.

The statement in the first of the reporter's head-notes, in the case of Wheeler v. Carpenter, must be read in the light of the single question on which the case hung, viz., had the defendant such an interest in the land, by virtue of his reservation of the pine trees, as gave him a right of entry and took him out of the operation of the act of 1824? We held that he had an interest in the land which gave him a right of entry to select, cut, and remove his timber, and that, as a tenant in common would be protected by his right of entry, so the defendant was protected. But it is thought that the recent case of Shiffer v. Broadhead, 126 Pa. 260, is in conflict with Wheeler v. Carpenter and Boults v. Mitchell, and a glance at that case is therefore necessary. It was tried before a referee to whom the questions of fact and law were submitted. He found, as a fact, that the defendant did cut three hundred and fourteen trees that belonged to the plaintiff, without the consent of the owner. This finding, whether it should have been made on the evidence or not, was like a verdict, conclusive of the fact. The question of law before us was whether, upon this finding, the defendant was liable under the act of 1824. Our Brother STERRETT, who delivered the opinion of the court, very carefully put the findings of the referee in the foreground, and said, in effect, that the defendant was brought by them within the provisions of the act of 1824. In our case there is no verdict against the defendant, but the existence of his right of entry and the nature and extent of his interest in the standing timber and the land upon which it was growing, come directly to us for determination upon the construction of the contract under which he justifies. The view we have taken of that subject renders an examination of the several assignments of error unnecessary. This judgment must be affirmed, not

upon the rulings of the learned judge before whom it was tried, but because the proper construction of the contract of 1850 requires it.

On looking over the testimony, we cannot escape the conviction that the several parties interested have heretofore understood the contract as we have construed it. Silas Billings left as the plaintiff tells us, six children besides herself to survive him. Her share of this large body of land was, as settled by the proceedings in partition, less than seven hundred acres. Seventeen years were occupied in removing the timber. After this was accomplished, sixteen years more passed, during which the heirs at law of Billings had the exclusive possession of their respective purparts of the land. Thirty-six years after the contract was written, this action was brought. A region comparatively inaccessible in 1850 had been in the meantime penetrated by railroads, and brought into nearness to markets. The value of land and of standing timber had increased to five or six or more times its value in 1850. After this extraordinary lapse of time, and the changes that have been wrought by it, we have, set up for the first time, the position that the contract should be construed as a reservation of all pine, norway, and oak logs, less then twelve inches in diameter at the smallest end, no matter how fit they may be for sawing, nor how merchantable according to the usages of the trade. As we are satisfied that the judgment is right, we ought not to reverse it because the reasons given by the learned judge are wrong.

The judgment is affirmed.